So we'll move to our next case, which is United States v. Jackson. Mr. or Ms. O'Connell Miller? I'll be a Mr. Pardon? I'll be a Mr. Oh, okay. Sorry. Yes, you can proceed. Good morning, and may it please the court. My name is Leighton O'Connell Miller, and I represent Jeanette Faria, one of the two defendants in this consolidated case. During my time before the court this morning, I want to try to address three issues with you. First, the violation of Ms. Faria's confrontation clause rights due to the statements that Mr. Jackson made during his closing statement at trial. Confrontation clause? Correct, Your Honor. Have you argued that in the brief? Yes, Your Honor, that's in the brief, and it was also in the post-trial motion. Was it part of the objection in closing? There were a number of objections made. I don't think it was specifically objected to verbally at the time, but there were a wide variety of objections made. Actually, by the government, there were repeated objections made. Sure, but did Ms. Faria ever object to Mr. Jackson's pro se closing? Ms. Faria did not object verbally at the time. During the closing argument, she did not. Did she object non-verbally? Your Honor, she objected in the post-trial motion. She raised the confrontation clause issue, but no, she didn't object during the closing argument. There were repeated objections by the government, and it would have been redundant, essentially. No. Okay. Very different stakes for the government and for Ms. Faria. Ms. Faria raised the confrontation clause issue in the post-trial motion. She did that because in the course of Mr. Jackson's closing argument, he discussed a contract that he created for ABC Cicero Kids. And just to clarify for a second, there are three daycare centers at issue in the indictment. One is called Jubilee. One is called St. Peter's. One is called ABC Cicero Kids. Ms. Faria was only ever involved with ABC Cicero Kids. During the closing argument, Mr. Jackson referred to a contract he created related to ABC Cicero Kids that said that parents agreed for the center to allow children to be counted as present for any time of attendance, whether they were there that individual day or not. The only way that that ever came out, according to the government, in testimony at trial, was through the first day testimony of Lakeesa Jackson. But Ms. Jackson's involvement was not with ABC Cicero Kids. Ms. Jackson's involvement, if I remember correctly, was with St. Peter's and possibly the start of the Jubilee Daycare Center as well. So that testimony, which was the only testimony about a contract that would clearly violate state law because it would misreport the actual dates of attendance for the children, the only testimony at trial that was actually made didn't relate to the two daycare centers that Ms. Faria, or to the daycare center ABC Cicero Kids that Ms. Faria was actually involved in. So functionally, during his closing statement, Mr. Jackson convicted himself, in Ms. Faria's opinion, and by doing so created the inference that Ms. Faria had acted with him. The second issue I want to address is that there's no direct evidence anywhere in the trial that shows an intent to defraud on behalf of Ms. Faria. There were a total of 14 different witnesses, two of whom were directors of the center, Ruth Magos and Robin Braylower, who testified. A number of those individuals testified that their children didn't attend on days where there were daycare certificates, attendance certificates submitted to Illinois Action for Children. However, not a single witness said they ever saw Ms. Faria complete a daycare certificate, not a single witness. Didn't she tell the FBI that she filled out those forms and used an alias to do so? She told the FBI that she did fill out the forms. She did, on a percentage of the forms, use the alias Anna Ortiz. And claims were submitted for reimbursement for five months after the town of Cicero closed down the facility? Claims were submitted. It was not clear during trial if it was possible that there were still children attending the center, even though the town of Cicero did close down the daycare center. No question about that. There is some question in the trial testimony as to whether or not there were still children in attendance at the facility at that point in time. And, of course, Ms. Faria didn't testify, so we don't know functionally what her involvement was. We don't know if she just signed the forms. We don't know how she got the attendance records. In fact, Ms. Magos and Ms. Braylauer, I think Ms. Braylauer said she at most saw Ms. Faria a total of three or four times at the daycare center itself. She was actually living in the state of Georgia outside of Atlanta at the time, and so the only thing she really did was submit the forms. She wasn't there to take attendance. Sorry. When is Ms. Faria scheduled for release? She is scheduled for release, I believe, end of January. She began serving her sentence mid-December. Okay, and I'd just like to ask you very quickly about this, the closing argument point. Yes, Your Honor. Is it your contention that the district judge was obligated to declare a mistrial? Yes, Your Honor, that is my contention. Okay, let me tell you why that might not be a good idea, and you can tell me why I'm wrong. Yes, Your Honor. Suppose Ms. Faria and her lawyers thought things were going really, really well for her in this trial. Your Honor, I was the second chair of the trial. A district judge's grant of a mistrial means she has to go through another trial where she might not fare so well. So there are pretty rare circumstances that require a district judge to grant a mistrial sua sponte without any objection. I would agree with that, Your Honor. I would say that this is one of those situations. As I said, I was the second chair. In fact, all of the counsel here were involved in the trial. We felt that we had a very winnable case because Ms. Faria, frankly, wasn't present for any of this. She was only there three times. It was really not until Ms. So why would you want a mistrial in the middle of a closing argument? Because in closing argument, Mr. Jackson. But didn't ask for it. Mr. Jackson, he did ask for it in the post-trial motion, Mr. Jackson. The post-trial motion is late. I understand your point. Thank you. Thank you. Okay, thank you. Mr. Madden? I'm sorry, Mr. McQuaid. My mistake. Your Honor, may it please the Court. Matthew McQuaid on behalf of Herman Jackson. Herman Jackson argues on appeal the same argument that he raised at trial, that the evidence that the government presented did not prove that he intended to defraud the state of Illinois or Illinois Action for Children. He maintains and maintained then that he did not intentionally create or participate in a scheme to cheat the state out of child care subsidy funds using the three separate daycares. Mr. Jackson contended and contends that the government's evidence actually supported his defense, despite the theory put forward by the prosecution. And on appeal, Mr. Jackson raises several arguments in support of that. The government attempted to portray Jackson's lifestyle as luxurious and extravagant, highlighting the cars that he was driving, the houses that he owned. The Bentley was used, right? Yes, sir. The Bentley was used, leased, and then quickly repossessed. I believe there was a Mercedes that was used, leased, quickly repossessed. The homes that he owned were not lavish. They were all financed with mortgages and, again, quickly put into foreclosure due to his generously suspect business practices as far as paying his bills. He took no trips to exotic locations, no expensive vacations. He made no extravagant purchases with the money. The money that came in was funneled back into the church that he had bought and then tried to maintain and build a congregation. Jackson states that his business decisions were misinformed and naive. He presented testimony through his ex-wife, Lakecia Jackson, I believe that he did recall her in his case in chief, proposing this particular contract where he prepared for prospective daycare parents, allowing the centers to build Illinois Action for Children based on enrollment but not attendance. Jackson attempted to prove at trial that he had to fight the state agencies to keep the daycares open, and this contract was evidence of his lack of sophistication in business and was evidence of his innocent intent and misunderstanding. What evidence do you think the government offered that the jury was required to disbelieve? Judge, the only thing I would say is possibly the evidence of some of the people that were employed by the daycare that indicated that their kids were being billed for time they weren't there. This was a handful of witnesses, Your Honor, so I know that there was numerous other witnesses who came in who were not involved with the daycare other than being billed for their kids never being there, so I'm separating that. I would believe, in my opinion, the only evidence would be that when Jackson confronted them with these certain timesheets indicating that their children were there when they said they weren't there, it showed embellishment more than a complete contradiction, but it did show the embellishment. A credibility issue. A credibility issue. But not required to disbelieve. Not required to disbelieve, but credibility. And again, I would say it was a partial contradiction, not a full contradiction. Your Honor, for those reasons and those that are raised in the brief, Mr. Jackson is asking that his conviction be reversed. Okay, thank you, Mr. McQuade. Mr. Madden? Thank you, Your Honor. May it please the Court, Matthew Madden on behalf of the United States. I'll start with Faria's argument on the Confrontation Clause and Jackson's closing statement. District Court did not commit plain error by not swa sponte, granting a mistrial, during the middle of Jackson's closing. First, Faria never objected a single time during Jackson's closing statement. She never moved to sever at any point before trial or during trial. I gather, Mr. Madden, you were fairly busy during the closing. I was. I objected numerous times, but Faria never objected. The other point I want to make is Jackson was the first defendant in the case, so he argued first for the defense. That meant that Faria's closing came after that, so Faria had an opportunity to respond to what Jackson said. She never did. There was nothing really in that closing that was directly responsive to Jackson's statement. She had the opportunity to respond to what Jackson said but never did because Jackson never pointed the finger at her. Their defenses were not mutually antagonistic. To the extent that there was any finger pointing in this case, it went in the other direction from Faria to Jackson. And, in fact, if the judge had granted a mistrial, swa sponte in this case, there's a good argument that she would have been undercutting Faria's defense because Faria had been setting up a defense throughout trial that she was similar to Lakeisa Jackson, his ex-wife, who was involved in the first two daycares, and Denise Pugh, who was the front nominee owner of the second daycare. You can see that in the cross-examination of Lakeisa Jackson and other witnesses that she was setting up the argument that Jackson was the architect of this. He was the most culpable person. And she was more similar to Denise Pugh, who she said was a know-nothing nominee owner, and Lakeisa Jackson. Only the patsy, I think we used to call her. Exactly, Your Honor. And so if, in fact, without any objection at all from Faria during his closing, she had granted a swa sponte mistrial, she might have been worse off in the later trial. And it even sounds like we have admission here that the defense thought the trial was going very well, so it would have made little sense for there to be a mistrial at that point. But in short, the defenses were not mutually antagonistic. Faria may well have benefited from the joint trial, given the disparity in evidence against Jackson as opposed to her, and for that reason it was not plain air for the district court to swa sponte grant a mistrial. With respect to Faria's sufficiency of the evidence argument, there was plenty of evidence from which a rational jury could have convicted her on the fraud count, so that should be affirmed. Over the course of more than a year, Faria, as she admitted to the FBI, used an alias name to submit numerous false monthly certifications to get subsidies that she was not entitled to from Action for Children. The false statements on those documents included billing for children that never attended, billing full time for children that only attended part time, billing for children after they left and were no longer at the daycares, and then also a very long course of billing from February 2011 to July 2011 for services that never occurred because the town of Cicero had shut down the daycare at that point. So those false statements themselves are, of course, evidence of her intent to defraud. The jury verdict was also supported as to Faria by her attempts to conceal her involvement in the fraud. That, of course, came from her use of the alias name Anna Ortiz, which is all over documents that have false representations in them, and then also her statements and lies to the FBI. When they came and approached her, she said that they were sneaking in children from the side door after the town of Cicero shut down the daycare, and there was simply no evidence to support that at all. That was just an attempt to derail the FBI. She was also challenged by two separate employees who had children who were going there. The most telling challenge was from Natalie Navarro. That was in mid-2010. Navarro let her know, I know that you're billing for my children full time, despite the fact that they only went part time, and her response was not to deny it. It wasn't to express surprise. She said, don't worry about it. I'll get you more hours, which means I'll get you more money, and she also said, look at it this way. You don't have to make a copay. The jury could have reasonably concluded that that was an admission that Faria knew that this was a fraud and that she was telling her worker to be quiet about it because she was also benefiting from it. So in short, there's additional evidence, but there's plenty of evidence from which the jury reasonably convicted her, and so the court should reject the sufficiency challenge on Faria. With respect to Jackson, the evidence against him honestly was overwhelming, and it was clearly sufficient for a rational jury to find him guilty. He was the architect over this fraud. It occurred over a period of eight years. There were dozens and dozens and dozens of false submissions to Action for Children, and, of course, the same types of false statements that I described for Faria were in those documents that Jackson submitted, and he also attempted to conceal his involvement in the scheme by regularly using the alias name and then also by using fronts like Denise Pugh, the owner of the second daycare, and the whole point of him using those fronts was to distance himself from the fraud in case he was approached by regulators like the FBI, and that's, of course, what he did. When the FBI approached him, he said he told the FBI agent that I have no affiliation with Jubilee or I have no affiliation with Jubilee, and that's because he'd set up Denise Pugh as this front here, so he completely lied about that, which is evidence of his deceit. Mr. Madden, could I just ask, the way this worked, the key submissions were these monthly certificates? Yes. Is that right? Okay, so basically. Yes, and so what happened with the monthly certificates, Your Honor, is the daycare center together with the parent would submit the application. Once the application was approved, they were paid. For the child. For the child, for one or multiple children. Once the application was approved, then they were approved for six months, and they could start billing for these children. And then once that was done, the state would. Jackson is calling, Jackson. Too late. Do you want to take it? Once that was done, then the state would send monthly certificates to the daycare center that listed the names of the children and their biographical information, and there was a part on the right-hand side where they had to fill in, the daycare center had to fill in the number of dates. That's the claim for payment. Pardon me? That's the monthly claim for payment. Exactly. Okay. So those were the key submissions, and there were many false statements about the number of days attended on those. So the evidence against Jackson was extremely strong. His use of aliases, his bribes to the Action for Children employee to process his paperwork, and then also his use of fronts and nominees throughout the process. The points raised by his attorney here were largely beside the point, the fact that the Bentley was used as opposed to new. There was evidence, of course, that he did have an extravagant lifestyle. He had a Bentley. He had a Mercedes, numerous residences. He flew back and forth between Atlanta. So the jury could have reasonably concluded that he did engage in an extravagant lifestyle from the fraud, but the reality is, is the evidence against him. Even a used Bentley is extravagant. True. I agree, Your Honor. But in the end, the evidence against him was overwhelming. It was clearly enough for a reasonable jury to convict him. Unless this Court has any other questions, I'd simply ask the Court to affirm both defendant's convictions and affirm Faria's sentence. How old is Faria? I believe she is in her 40s or late 30s. Does she have young children? She and Jackson had one child while the case was pending. We had a trial date set, and then it got kicked because of the pregnancy. So I know that they have that one child together. I don't. She may also have other children, but I'm not certain. I think there's a problem with sending women to prison who have very young children. Pardon me? Isn't there a problem with sending women to prison who have very young children? No. I think that was something that was raised at the sentencing, though. What? Judge Coleman gave Faria numerous continuances of her surrender date, in part because of some health issues Faria was having, and also in part to make sure that she could make arrangements for child care. Okay. Well, thank you, Mr. Madden. Thank you, Your Honor. So anything further from Mr. O'Connell Miller? I'll be very brief, Your Honor. Briefly, if I can just also answer your questions. Ms. Faria has three children, including, at the time of her surrender, was an infant. Ms. Faria, I believe, is 36 years old, just so that you're aware. How old? At 36, I believe, Your Honor. At the time of trial, she was. Yes, but how old are the children? The children's ages are, she is a now, I think, one-and-a-half-year-old, or maybe two-year-old, and then the other two children are, one of them, I think the boy is in his early teens, and there's a girl in her late teens as well. And then if I could briefly touch back on the intent issue, I think Mr. Madden really identifies what the fundamental lack of evidence is, which is that Mr. Jackson did use a series of individuals like Denise Pugh and Lakeesa Jackson as fronts. Ms. Faria simply was never present more than three or four occasions at the daycare center. She was signing documents and submitting them, but she had no knowledge of what the actual attendance was. That information was being provided to her by somebody else. There was no actual evidence showing that Ms. Faria filled out incorrect daycare, that knowingly filled out incorrect attendance information or information she felt was inconsistent with contractual terms of the parents. Did the document require her to say, I know this is true? I believe it just requires a signature. I'm trying to think of what the exact language is on the document. I don't have a copy in front of me, but I could certainly follow up with an answer to that, Your Honor. Thank you. I just have one question. I didn't see anywhere in your brief describing Faria as some innocent tool of Jackson. That was not. So it seems as if she knew what she was doing. She wasn't being deceived by him. Your Honor, the fact that I didn't, in the narrative of the brief, go into that specific theory, that was really the basis of the insufficiency of evidence at trial and the post-trial motion. Charles Dickens did the same thing, if you remember Oliver Twist. That theory is in there. It's not clear. I will grant that, certainly. But that was certainly the basis of Ms. Faria's closing argument that she was being utilized by Mr. Jackson. And that was the subject of the post-trial motion. That was why we felt, Ms. Winslow and I, that there was insufficient evidence of intent to convict Ms. Faria. Okay. Well, thank you, Mr. McConnell. Thank you, Your Honor. Mr. McQuaid, do you have anything further? Nothing further. Okay, well, thank you very much to all counsel. Court appointed. Court appointed. Court appointed. All right. Okay. Okay, our next case is